**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

MATEO LUNA,

     Plaintiff,

v.                                                                                        Civ. No. 20-202 JCH-JHR

UNUM LIFE INSURANCE COMPANY
OF AMERICA,

     Defendant.

**MEMORANDUM OPINION AND ORDER**

After paying long-term disability ("LTD") benefits to Plaintiff Mateo Luna for two years,

Defendant UNUM Life Insurance Company of America ("UNUM") determined that Mr. Luna was

no longer disabled under the terms of his employer sponsored plan and terminated LTD benefits.

Mr. Luna administratively appealed, and UNUM upheld the termination of LTD benefits on

appeal. Mr. Luna then filed suit in state court seeking reinstatement of his LTD benefits under the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461. (*See*

Compl., ECF No. 1-2). On March 6, 2020, UNUM removed the case to this Court on the basis of

federal question and diversity jurisdiction. (Notice of Removal 1-2, ECF No. 1).

On August 31, 2020, the parties filed cross-motions on the merits of Mr. Luna's complaint.

(*See* Pl.'s Mem. Br., ECF No. 18 ("Mr. Luna's Motion"); UNUM'S Mot. for Decision on the

Administrative Record, ECF No. 20 ("UNUM's Motion").) The parties timely filed response

briefs. (*See* UNUM'S Opposition to Luna's Mem., ECF No. 26) ("UNUM's Response"); Pl.'s

Cross Mem. Br., ECF No. 27 ("Mr. Luna's Response").) Having performed a *de novo* review of

the administrative record and considering the parties' submissions and the applicable law, the

Court determines that UNUM's administrative decision should be affirmed. Mr. Luna has not

shown by a preponderance of the evidence that he remained disabled within the meaning of his employer sponsored plan as of June 5, 2018, when UNUM denied him continued LTD benefits. Therefore, the Court will deny Mr. Luna's Motion and grant UNUM's Motion.

## I.  STANDARD OF REVIEW

ERISA affords plan beneficiaries the right to have a federal court review a denial of benefits. *See* 29 U.S.C. § 1132(a)(1)(B) (providing that a plan participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan"). "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In this case, both parties agree that Mr. Luna's employer sponsored plan does not give UNUM discretionary authority and therefore, the Court applies *de novo* review. (*See* Joint Status Report 5, ECF No. 7; *see also* Mr. Luna's Motion 2, ECF No. 18; UNUM's Motion 3, ECF No. 20.)

Under the *de novo* standard, the Court's task "is to determine whether the administrator made a correct decision." *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 832 (10th Cir. 2008) (unpublished) (quoting *Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir. 2002)). UNUM's decision is not afforded deference or a presumption of correctness. *See id*. Instead, the Court must "independently weigh the facts and opinions in the administrative record to determine whether the claimant has met his burden of showing that he is disabled within the meaning of the policy." *Richards v. Hewlett-Packard Corp.*, 592 F.3d 232, 239 (1st Cir. 2010). To

prevail, a claimant's entitlement to benefits must be supported by a preponderance of the evidence based on the Court's independent review of the record. *See Niles*, 269 F. App'x at 833.

## II. BACKGROUND

Mr. Luna began working as a principal systems engineer for Alion Science and Technology Corporation ("Alion") in 2008. (*See* AR, ECF No. 25-1 at 78, 119, 147.)[1] During the period at issue in this case, Alion provided Mr. Luna with long-term disability insurance through UNUM Policy Number 602108 001 (the "Plan"). (*Id*. at 147–87.) Mr. Luna was a full-time Alion employee until he stopped working on March 1, 2016. (*Id*. at 77–78.) Mr. Luna received short-term disability benefits until May 31, 2016. (*Id.* at 211.) On June 1, 2016, UNUM received a claim from Mr. Luna for LTD benefits to UNUM due to fibromyalgia, rheumatoid/osteoarthritis, and chronic pain. (*See id.* at 82–95.)

### A. Mr. Luna's medical history prior to applying for LTD benefits and his LTD claim submission

In May 2015, Mr. Luna saw his family practice physician, Dr. Roland Sanchez, M.D., for right shoulder pain. (AR, ECF No. 25-1 at 75, 564.) Mr. Luna reported the shoulder pain as "severe and 10 on a scale of 0-10." (*Id*. at 564) Dr. Sanchez listed Mr. Luna's problems as osteoarthritis, rheumatoid arthritis, and bursitis of the right shoulder, the former two issues with a date of onset of May 19, 2015. (*Id.*) Dr. Sanchez noted that Mr. Luna's right shoulder was tender upon palpitation. (*Id*. at 565.) Dr. Sanchez administered a trigger point injection. (*Id*.) Dr. Sanchez's notes do not reflect the specific basis for the former two diagnoses. (*See id.* at 565-65.)

On June 17, 2015, Mr. Luna returned to Dr. Sanchez's office for right arm pain, stating that he had tossed a heavy object and felt a "ripping sensation" in his right arm. (*Id*. at 562.) At a

---

[1] Electronic Court Filing documents 25-1 to 25-6 constitute the Administrative Record ("AR") filed in this matter. The Court cites to the CM/ECF pagination rather than any internal page numbers in the AR.

July 17, 2015 follow-up visit after an MRI, Dr. Sanchez reported that the tests showed that Mr. Luna had suffered a right shoulder rotator cuff tear. (*See id*. at 560–61, 563.)

On September 10, 2015, Mr. Luna had an initial visit with Dr. Donnie Lujan, MD, with New Mexico Orthopaedics. (*Id*. at 489.) Dr. Lujan diagnosed him as suffering from a right rotator cuff tear as well as osteoarthritis in his right shoulder. (*Id*. at 490.) After discussing surgical and non-surgical options with Dr. Lujan, Mr. Luna elected to proceed with surgery on his right shoulder. (*Id*.) On September 28, 2015, Dr. Lujan performed surgery on Mr. Luna's right shoulder. (*Id*. at 508.) At his post-op visit with Dr. Lujan on October 6, 2015, Mr. Luna reported that he was "doing fine" and "experiencing no pain post-operatively" or numbness. (*Id*. at 487.) Dr. Lujan's physical examination of Mr. Luna's right shoulder showed mild anterior pain/tenderness and limited motion. (*Id*. at 488.) Dr. Lujan prescribed medication for Mr. Luna to take as needed for nausea and pain and recommended that Mr. Luna undergo physical therapy. (*Id*. at 487-88.)

A few weeks later, on October 28, 2015, Mr. Luna returned to Dr. Sanchez's office, seeking a referral for physical therapy. (*Id*. at 558.) Mr. Luna indicated that he still had moderate right shoulder pain. (*Id*.) Dr. Sanchez referred Mr. Luna to physical therapy where records show he had thirteen sessions, beginning in mid-November 2015 through early January 2016. (*See id*. at 327–28, 337, 559.) On at least two occasions, Mr. Luna reported to his physical therapist that he was experiencing pain because his osteoarthritis and rheumatoid arthritis had flared up. (*See id*. at 349, 356.) During other sessions, Mr. Luna indicated that his shoulder was doing better, and his physical therapist noted that Mr. Luna tolerated the therapy well. (*See, e.g.*, *id*. at 351 (shoulder is feeling sore but "[d]id well with program today"); *id*. at 353 (reported shoulder is "feeling pretty good"); *id*. at 354 ("shoulder is feeling much better today"); *id*. at 358 (reported "shoulder is feeling pretty good" with daily improvement and he "tolerated treatment well").) After thirteen therapy sessions,

4

Mr. Luna's physical therapist assessed that he "demonstrates full PROM [posterior range of motion], but has some anterior and inferior capsule tightness. His AROM [anterior range of motion] is WFL [within functional limits], but he fatigues very quickly, after 10-12 repetitions." (*Id*. at 345.) Although Mr. Luna could benefit from continued physical therapy (*id.* at 345), Mr. Luna's last therapy session was on January 4, 2016, and he was subsequently discharged from physical therapy after he stopped showing up for appointments, (*id*. at 342).

In February 2016, Mr. Luna saw Dr. Sanchez three times. On February 1, 2016, Dr. Sanchez evaluated Mr. Luna for complaints of severe right shoulder pain, osteoarthritis, and arthritis. (*Id*. at 605.) Dr. Sanchez sent Mr. Luna for bloodwork. (*Id*. at 606.) On February 19, 2016, Mr. Luna returned to the clinic with cold symptoms, but also reported severe left shoulder and neck pain as well as chronic body pain. (*Id*. at 602.) Mr. Luna's physical exam showed a number of tender points and several areas that were tender to palpitation. (*Id*. at 603.) Dr. Sanchez assessed that Mr. Luna had fibromyalgia and rheumatoid arthritis involving both hands with a positive rheumatoid factor. (*Id*.) He referred Mr. Luna back to his orthopedist, Dr. Lujan, for follow-up evaluation of his shoulder pain. (*See id*. at 604.) In addition, Dr. Sanchez referred Mr. Luna to Dr. Leroy Pacheco of NM Rheumatology for an evaluation. (*Id*. at 482, 604) On February 29, 2016, Mr. Luna saw Dr. Sanchez for headaches and to follow up on his fibromyalgia symptoms, which he reported were causing him severe pain at a "10 on a scale of 0-10." (*Id*. at 593.) A physical examination of his lumbar spine showed stiffness, tenderness upon palpitation, and spasms. (*Id*. at 594.) Dr. Sanchez prescribed certain medications and noted that Mr. Luna was "acutely disabled [and] will not work for now." (*Id*.) Mr. Luna did in fact stop working around this time, with his last reported day at work being March 1, 2016. (*Id*. at 77.)

Mr. Luna had his follow-up orthopedics visit with Dr. Lujan on April 25, 2016. (*Id*. at 517.) Mr. Luna told Dr. Lujan that he was doing fine and experiencing no pain, swelling, or numbness in his right shoulder post-operatively. (*See id*.) Dr. Lujan noted that Mr. Luna was "[o]verall stable but with loss of strength." (*Id*. at 518) He also stated that the medication Mr. Luna was taking for fibromyalgia seemed to be helping, and he ordered additional physical therapy treatment. (*Id*.)

On May 25, 2016, Mr. Luna submitted his LTD claim, which included an Attending Physician Statement completed by Dr. Sanchez. (AR, ECF No. 25-1 at 72–75.) Dr. Sanchez stated that Mr. Luna was "totally disabled" and "unable to work" due to arthritis, obesity, gait impairment, fibromyalgia, and depression. (*Id.* at 74) According to Dr. Sanchez, the duration of Mr. Luna's disability was a period of one year, ranging from May 25, 2016 through May 26, 2017. (*Id*. at 74.) Beyond summarily stating that Mr. Luna was totally disabled and unable to work,[2] Dr. Sanchez did not complete the portions of the form that asked him to describe Mr. Luna's current physical or behavioral "RESTRICTIONS (activities patient should not do) and/or PHYSICAL LIMITATIONS (activities patient cannot do)." (*Id*.)

Shortly after submitting his claim, on June 8, 2016, a UNUM disability benefits specialist interviewed Mr. Luna by phone about his claim, specifically asking him questions regarding his medical history, date of disability onset, duration of disability, and his functional capacity. (*See id*. at 205–11, 280-83.) Mr. Luna stated that his pain began with the May 2015 rotator cuff tear, and he returned to work following surgery with a travelling restriction, which his employer accommodated. (*Id.* at 205.) According to Mr. Luna, physical therapy seemed to advance his arthritis and rheumatoid arthritis. (*Id*.) Mr. Luna reported to the benefits specialist that he had "pain

---

[2] Dr. Sanchez made these statements despite UNUM expressly stating on the form that "a reply of 'no work' or 'totally disabled' will not enable [UNUM] to evaluate [the] patient's claim for benefits" and could necessitate additional clarification. (AR, ECF No. 25-1 at 74.)

all over his body," that the "pain is anywhere from 8-9/10 and sometimes is a 10/10," and that he was in pain all the time except when he is asleep. (*Id*. at 208–09.) Mr. Luna also indicated that he was having difficulty bathing and dressing, needed assistance from his wife with "the things he need[ed] to do," was no longer able to drive, and could not use his hands because of rheumatoid arthritis and "excruciating pain." (*Id*. at 208.) In addition, Mr. Luna reported limited mobility, indicating that he could not "stand longer than 5 minutes and can't sit for more than 5 minutes before he has to get up" because of the total body pain. (*Id*.) He indicated that he was using a cane to ambulate as well as a wheelchair. (*Id*.) Mr. Luna also said he has cluster headaches, has 98% mobility in his shoulder, but is so weak he could not even lift up a book. (*Id.* at 206.) Mr. Luna stated he did not feel he would be able to return to work. (*Id.* at 208.)

UNUM informed Mr. Luna that under the terms of the Plan, UNUM defined disability as when Mr. Luna was "limited from performing the material and substantial duties of [his] regular occupation due to [his] sickness or injury; and [Mr. Luna had] a 20% or more loss in [his] indexed monthly earnings due to the same sickness or injury." (*Id*. at 281; *See also id*. at 160 (emphasis removed).) Under the Plan, after 24 months of payments, Mr. Luna is "disabled when Unum determines that due to the same sickness or injury, [he is] unable to perform the duties of any gainful occupation for which [he is] reasonably fitted by education, training or experience." (*Id.* at 160 (emphasis removed).)[3] According to the Plan, Mr. Luna had to "be under the regular care of a physician in order to be considered disabled." (*Id.*)

### B. Mr. Luna's medical history following his claim submission and UNUM's initial approval of Mr. Luna's LTD claim

---

[3] A regular occupation is defined in the Plan as "the occupation [the claimant is] routinely performing when [his/her] disability begins." (AR, ECF No. 25-1 at 177.) UNUM looks at the claimant's occupation "as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." (*Id*.)

Mr. Luna's first rheumatology appointment was on June 22, 2016, with Dr. Leroy Pacheco, MD. (AR, ECF No. 25-1 at 577.) Based on Mr. Luna's reported symptoms, Dr. Pacheco's initial inclination was that Mr. Luna might have polymyalgia rheumatica ("PMR") with temporal arteritis. (*Id*. at 577, 579, 639.) Dr. Pacheco conducted an ultrasound of the temporal arteries, which showed adequate pulses and no signs of the "typical flare seen on examination." (*Id*. at 579.) Dr. Pacheco ordered bloodwork, prescribed prednisone, and asked Mr. Luna to consider undergoing a sleep study. (*See id*.) Dr. Pacheco concluded that Mr. Luna's symptoms were likely a pulmonology issue and "less likely rheumatoid arthritis." (*Id*.)

While undergoing his rheumatology and orthopedic work ups, Mr. Luna continued to see Dr. Sanchez from March 2016 through June 2016. (*See id*. at 599 (3/10/2016 office visit); *id*. at 596 (4/5/2016 office visit); *id*. at 590 (5/4/2016 office visit); *id*. at 587 (5/23/2016 office visit); *id*. at 584 (6/23/2016 office visit).) During these visits, Mr. Luna reported moderate to severe shoulder pain, chronic pain, cluster headaches, and symptoms of fibromyalgia and rheumatoid arthritis. (*See id*. at 587, 590, 596, 599.) Dr. Sanchez prescribed various medications to treat Mr. Luna's symptoms, and he referred Mr. Luna to pulmonology for evaluation. (*Id*. at 592.) At his June 23, 2016 appointment, Mr. Luna informed Dr. Sanchez that Dr. Pacheco had diagnosed him with giant cell arteritis and polymyalgia rheumatica and he was now only taking prednisone. (*See id*. at 585.)

Mr. Luna next saw Dr. Pacheco on July 6, 2016, for a follow up visit. (*Id*. at 634–35.) After reviewing Mr. Luna's recent lab results, Dr. Pacheco noted that the labs were negative for CCP and his CRP was mildly elevated, and that the prednisone had seemed to resolve his symptoms until about three days prior. (*Id.* at 634.) Dr. Pacheco stated he was "not sure absolutely that he is pulling a dramatic or temporal arteritis." (*Id*. at 635.) Dr. Pacheco increased the dosage of prednisone, referred Mr. Luna for a sleep study, and asked him to follow up in about a month. (*Id*.)

On August 9, 2016, a UNUM benefits specialist called Mr. Luna to discuss his claim. (AR, ECF No. 25-1 at 641.) Mr. Luna reported that Dr. Pacheco ruled out fibromyalgia and rheumatoid arthritis, but he diagnosed him with giant cell arteritis and PMR. (*See id.*) Mr. Luna reported Dr. Pacheco's diagnosis and said the steroids have reduced his pain level from a 10/10 to a 2/10. (*Id.*) Mr. Luna, however, informed the benefits specialist that he was unable to work because he was "in a fog/confusion." (*Id.*) Mr. Luna explained that:

> during the day he is in a fog. He is not doing much. [He] said that he still [is] not functional yet…. [He] said that he is not using the phone and not on the computer. He is laying down and asleep in a chair. Things are confusing to him. He said that his wife will tell him to get her something and he will keep asking her what she needs because he forgets. If they go into town to eat, he will forget where they are going. They have helped him w/his pain but he is still suffering from all of the other things that are going on.

(*Id.*)

Based on the medical evidence to date and Mr. Luna's occupational duties, UNUM approved Mr. Luna's claim for LTD benefits on August 12, 2016. (*Id.* at 669.) In its approval letter, UNUM stated that it had determined Mr. Luna was "unable to perform the material and substantial duties of [his] regular occupation due to [his] symptoms of persistent widespread diffuse and chronic body aches and tentative diagnosis of polymyalgia rheumatica with temporal arteritis."[4] (*Id.*) Although it approved Mr. Luna's claim, UNUM indicated in the approval letter that it still planned to seek treatment notes from Mr. Luna's August 10, 2016 visit with Dr. Pacheco as well as Dr. Pacheco's and Dr. Sanchez's opinions on Mr. Luna's "current level of functional capacity." (*Id.* at 670.)

### C. Mr. Luna's medical history from LTD claim approval in August 2016 through July 2017, when he was approved for Social Security Disability benefits

---

[4] UNUM used March 2, 2016 as Mr. Luna's disability date, but it indicated that this date could change since UNUM was seeking additional information from Dr. Lujan and Alion to assess whether Mr. Luna was eligible for an earlier disability date based on his September 29, 2015 right shoulder surgery. (AR 669, ECF No. 25-1.).

UNUM continued to monitor Mr. Luna's medical condition following claim approval. At his August 10, 2016 visit with Dr. Pacheco, Mr. Luna stated that he wasn't having "any major problems with his hip and shoulder pain," but was experiencing recurrent headaches, cognitive issues and short-term memory problems. (AR, ECF No. 25-1 at 818.) Dr. Pacheco determined that Mr. Luna was doing well enough to warrant tapering the prednisone down to a lower dosage. (*Id*. at 819.) Dr. Pacheco repeated his belief that Mr. Luna had sleep apnea, and once again recommended that Mr. Luna undergo a sleep study because he believed sleep apnea was "a major part of his symptomatology at this point in time." (*Id*. at 818–19.)

Mr. Luna saw Dr. Pacheco twice more in 2016. At his September 27, 2016 visit, Dr. Pacheco noted his recent CRP shows a persistently elevated level, and he reiterated his strong belief that Mr. Luna had sleep apnea, but also noted that it was possible Mr. Luna had gastroesophageal reflux disease ("GERD"). (*Id*. at 821-22.) Given the uncertainty of what was causing his symptoms, Dr. Pacheco instructed Mr. Luna to taper to an even lower dose of prednisone. (*Id*.) Finally, Dr. Pacheco indicated his belief that Mr. Luna remained unable to work at that point, especially due to the cognitive issues he was experiencing. (*Id*. at 823.) At his next visit on November 15, 2016, Mr. Luna complained of recurrent headaches and increasing weakness that was causing balance issues. (*Id*. at 824.) Dr. Pacheco again expressed that Mr. Luna likely had sleep apnea "that may be confusing into a number of his symptoms." (*Id*. at 825.)

Per Dr. Pacheco's request, Mr. Luna saw Dr. Audrey Wells, MD, in her sleep medicine clinic for an initial evaluation on October 13, 2016. (AR, ECF No. 25-2 at 189.) Dr. Wells entered orders for a sleep study. (*Id*. at 190.) He was scheduled to get a sleep study in February 2017. (*See id.* at 92.)

Mr. Luna also began seeing pulmonologist Dr. Cory Hicks, MD, at the end of 2016. (AR, ECF No. 25-2 at 92.) At his November 22, 2016 visit, Mr. Luna complained of a chronic cough and did a six-minute walk test. (*See id.*) Dr. Hicks diagnosed Mr. Luna with dyspnea on exertion, chronic cough, morbid obesity, obstructive sleep apnea, and hypoxemia. (*Id*. at 92–93.) Dr. Hicks ordered bloodwork, an echocardiogram, and started Mr. Luna on oxygen, to be worn at least 17 hours daily and at night. (*See id*. at 93.) Mr. Luna saw Dr. Hicks in March 2017, at which time he continued to complain of shortness of breath and a chronic cough. (*See id*. at 95.) Mr. Luna reported his would get a sleep study in May 2017. (*Id.*) Dr. Hicks instructed Mr. Luna to continue using oxygen. (*Id*. at 96.)

Mr. Luna also continued seeing Dr. Sanchez throughout the remainder of 2016, with complaints of continued shoulder pain, chronic cough, joint pain, and sleep apnea, among other symptoms. (*See, e.g.*, AR, ECF No. 25-1 at 759–60 (8/11/2016 office visit); *id*. at 771 (9/19/2016 office visit); *id*. at 768 (9/20/2016 office visit); *id*. at 765–66 (9/26/2016 office visit); *id*. at 762 (10/13/2016 office visit).) In October 2016, Dr. Sanchez completed an Attending Physician statement. (*Id*. at 758.) Therein, Dr. Sanchez indicated that Mr. Luna had polymyalgia rheumatica, giant cell arteritis, chronic pain, and osteoarthritis. (*Id*.) Dr. Sanchez opined that not only was Mr. Luna unable to perform the occupational demands of his job on a full-time basis at that time but that he would also never be able to return to work. (*Id*. at 755, 758.)

Mr. Luna saw Dr. Sanchez in September 2016 for a new shoulder injury – this time to his left shoulder. (*Id*. at 771.) Dr. Sanchez assessed that Mr. Luna had sprained his left shoulder and referred him once again to Dr. Lujan. (*Id*. at 772-73.) Mr. Luna saw Dr. Lujan on November 1, 2016 for evaluation of his left shoulder, and he diagnosed Mr. Luna with suffering a left shoulder rotator cuff tear. (*Id*. at 907-08.)

At the end of 2016, Mr. Luna reported during a phone call with UNUM about his claim status that he was having a hard time standing up now. (AR, ECF No. 25-1 at 801.) On January 12, 2017, Mr. Luna filed an application for Social Security Disability ("SSD") benefits. (*Id.* at 848.) Later that month, Mr. Luna underwent surgery on his left shoulder. (*Id*. at 916-18.) At his post-op visit with Dr. Lujan on February 14, 2017, Mr. Luna stated that he was experiencing moderate pain post-operatively, but he was able to control the pain with medication. (*Id.* at 918.) Dr. Lujan referred Mr. Luna for occupational therapy. (*Id*. at 919.)

Six days later, Mr. Luna saw Dr. Sanchez for severe left shoulder pain and chronic headaches. (AR, ECF No. 25-2 at 146.) Dr. Sanchez referred him to his rheumatologist, Dr. Pacheco, and orthopedist, Dr. Lujan. (*Id*. at 148.) Dr. Sanchez also ordered a carotid doppler study, which was performed on March 10, 2017, and showed no hemodynamically significant disease. (*Id*. at 159.)

At his follow-up visit with Dr. Lujan on March 14, 2017, Mr. Luna reported that he was doing fine and experiencing no pain in his left shoulder post-operatively. (*Id*. at 294.) Mr. Luna had not yet begun therapy on his shoulder, so Dr. Lujan wrote an order for physical therapy, and instructed Mr. Luna to return for a follow up visit in six weeks. (*Id*.) Mr. Luna did not schedule a follow up visit, so his March 14, 2017 appointment was the last time he saw Dr. Lujan. (*Id*. at 306.) Later that month, Mr. Luna began physical therapy for his left shoulder, attending approximately six sessions between March 23, 2017 and April 12, 2017. (*See id.* at 65–86.)

Mr. Luna saw Dr. Sanchez in April 2017, reporting left shoulder pian, chronic headaches, arthritis, among other complaints. (*Id.* at 140.) In April 2017, Mr. Luna spoke with a UNUM disability benefits specialist regarding his functional capacity at that time. (*Id*. at 15–17.) He reported that he had not been able to use his left arm since his January 2017 surgery, and had not

12

regained strength in his right arm after his surgery on that shoulder. (*Id*. at 17.) Mr. Luna indicated he was unable to stand or walk for more than a few minutes at a time, and that he uses a wheelchair, two canes, or a walker. (*Id*.) He stated that he was "home most of the time and when at home he just moves from his bed, to the couch, to the bathroom and that is about it" due to his shoulder issues, shortness of breath, and general pain due to polymyalgia rheumatica. (*Id*.) With regard to daily activities, Mr. Luna stated that he was spending 14-15 hours daily watching television, and he needed assistance from his wife to help him with bathing, dressing, using the restroom, and eating. (*Id*.) He said that he stays in his robe throughout the day unless he has an appointment. (*Id.*) He reported that his doctor wanted him on oxygen 24/7, and he used it at night and when he needed it during the day. (*See id.* at 15.)

On July 11, 2017, Mr. Luna complained in an office visit to Dr. Sanchez of chronic headaches and arthritis. (AR, ECF No. 25-2 at 143.) That same month in July 2017, Mr. Luna told UNUM that his condition remained unchanged. (*Id*. at 123.) He stated that he was still not able to move around and continued to suffer from chronic pain that radiates throughout his body, recurrent headaches, and short-term memory issues. (*See id*.) Mr. Luna also informed UNUM that he had been awarded social security disability benefits. (*See id*.) A copy of Mr. Luna's benefits approval letter from the Social Security Administration ("SSA") was later provided to UNUM, which said the SSA found Mr. Luna disabled as of March 2, 2016.[5] (*Id*. at 208.)

**D. UNUM's test change investigation and Mr. Luna's medical care after July 2017**

---

[5] UNUM requested from the SSA Mr. Luna's disability file including all medical records. (*See* AR, ECF No. 25-2 at 330.) UNUM does not appear to have received a file from the SSA. (*See* AR, ECF No. 25-5 at 12, 477.) UNUM did, however, learn in early 2018 that Mr. Luna listed the following conditions on his application for SSD: rheumatoid arthritis, obstructive sleep apnea (on oxygen 24/7), giant cell arthritis, chronic pain, chronic cough, depression, osteoarthritis, muscle weakness, ruptured rotator cuff, bursitis in both shoulders. (*Id.* at 494.)

Under the terms of the Plan, to continue receiving LTD benefits after 24 months, the Plan required Mr. Luna to meet a stricter definition of disability—namely, that his medical condition rendered him "unable to perform the duties of any **gainful occupation** for which [he was] reasonably fitted by education, training or experience." (*Id.* at 350 (emphasis in original).) Since Mr. Luna began receiving benefits on May 31, 2016, (*see* AR, ECF No. 25-1 at 669), this change in the definition of disability was set to occur 24 months later -- on May 31, 2018, (*see* AR, ECF No. 25-2 at 350).

To prepare for this change in the definition of disability, on September 8, 2017, UNUM notified him by letter that his claim would be evaluated under the "any gainful occupation" definition of disability as of May 31, 2018. (*See id.* at 349-50.) UNUM informed Mr. Luna that it would be requesting updated information from him, his physicians, and his employer to "determine if the medical information continues to support your inability to perform the regular duties of your occupation as a Systems Engineer" and whether he has skills to perform other occupations. (*Id.*)

By the time the test change investigation began, UNUM had received on July 11, 2017, opinions from two of Mr. Luna's medical providers – orthopedist Dr. Lujan and pulmonologist Dr. Hicks – that Mr. Luna had regained the ability to perform the functional physical demands of his own occupation.[6] (*See* AR, ECF No. 25-2 at 214, 305–06.) Dr. Lujan opined that Mr. Luna could return to functional activities of his work and return to work as of March 14, 2017. (AR, ECF No. 25-2 at 306.)[7] Dr. Hicks reported that Mr. Luna was able to perform the functional

---

[6] UNUM determined and listed the physical demands of Mr. Luna's occupation as "[e]xerting up to 20 pounds of force occasionally to lift, carry, push, pull, or otherwise move objects," frequently (2.5-5.5 hours in an 8-hour day) sitting, keyboarding, talking, and hearing; occasionally (0-2.5 hours in an 8-hour day) standing, walking, reaching, handling, and fingering; and travel at times. (AR, ECF No. 25-2 at 305.)

[7] Dr. Lujan's office previously informed UNUM that any restrictions and/or limitations he may have had due to his right shoulder ended six months after the surgery on that shoulder. (AR, ECF No. 25-1 at 618.)

activities listed on a full-time basis, but he was deferring comment on functional capacity to Dr. Romero. (*Id.* at 214.)[8]

On the other hand, on September 19, 2017, Dr. Pacheco opined that Mr. Luna was unable to perform the functional demands of his own occupation. (AR, ECF No. 25-4 at 152–53.) Likewise, Dr. Sanchez indicated in July 2017 that Mr. Luna was not able to perform the occupational demands of his job on a full-time basis because he was disabled due to back pain and could not lift over five pounds. (AR, ECF No. 25-2 at 117–18.) Dr. Sanchez further opined that it was undetermined when Mr. Luna could return to work because he was "permanently disabled." (*Id*. at 118.)

In addition to seeking the opinions of Mr. Luna's medical providers, UNUM performed internet searches on Mr. Luna and his spouse in September 2017. *(See id*. at 356-57.) UNUM discovered numerous social media posts by Mr. Luna and his wife documenting recreational and travel-related activities during the time Mr. Luna was receiving LTD benefits. (*See*, *e.g.*, AR, ECF No. 25-3 at 25, 31, 159.)  It appeared that Mr. Luna and his wife purchased a recreational vehicle ("RV") in July 2016, approximately one month before his LTD claim was initially approved. (*See id.* at 29.) Mr. Luna traveled extensively since then, taking RV trips across multiple states, visiting multiple national parks and campgrounds, traveling to state fairs, attending a concert in another state, visiting golf resorts, and taking a fishing trip.[9]

---

[8] UNUM subsequently sought additional clarification from Dr. Hicks because there was no indication that Mr. Luna was ever treated by someone named Dr. Romero. (*See* AR, ECF No. 25-2 at 353) ("insured reports he does not see a Dr. Romero"). On January 2, 2018, Dr. Hicks clarified that he was not deferring to any other provider and reaffirmed his opinion that Mr. Luna could return to work. (AR, ECF No. Doc. 25-5 at 289–90.)

[9] Mr. Luna's recreational and travel activities are documented below:

| 6/28/2016 | "Drove north to check out some campgrounds", Tierra Del Sol Golf Club (AR, ECF No. Doc. 25-3 at 31.) |
| --- | --- |
| 6/30/2016 | Picture of Mr. Luna sitting in the driver's seat of RV (Doc. 25-3 at 159-60.) |

UNUM became concerned that Mr. Luna's self-reporting regarding his incapacity was contradictory to the travel and recreational activities posted on social media from mid-2016 through August 2017. (*See* AR, ECF No. 25-5 at 13, 15.) To resolve its concerns, in September

| 7/9/2016 | Fishing at "Escondia Lake" (*Id.* at 25.) |
|---|---|
| 8/20/2016 | "Drag races for lunch! – eating lunch at Colorado/Nebraska Border" (Id. at 78.) |
| 9/11/2016 | Boone, Iowa (*Id.* at 16.) |
| 10/4/2016 | Ute Mountain RV Park, Colorado (*Id.* at 7.) |
| 10/6/2016 | Chama, New Mexico and Pagosa Springs, Colorado (*Id.* at 5.) |
| 10/7/2016 | "Feeling humble, the drive from Chama to Espanola is something to see. RV'ing rocks!" (*Id.* at 72.) |
| 10/12/2016 | Trinidad, Colorado (*Id.* at 4.) |
| 3/19/2017 | Pecos National Historical Park (AR, ECF No. 25-4 at 69.) |
| 3/20/2017 | Trinidad Lake State Park, Colorado (*Id.* at 67.) |
| 6/4/2017 | Sleeping Ute RV Park & Campground, Colorado (*Id.* at 30.) |
| 6/5/2017 | Vernal/Dinosaurland RV Park, Utah (AR, ECF No. 25-4 at 29.) |
| 6/9/2017 | Grand Teton National Park (*Id.* at 25.) |
| 6/10/2017 | Missoula, Montana (*Id.* at 23.) |
| 6/11/2017 | Idaho (*Id.* at 21.) |
| 6/16/2017 | Oregon (*See id.* at 17.) |
| 6/21/2017 | Livermore, California (AR, ECF No. 25-2 at 391.) "attending Summer Sip & Shop at San Francisco Premium Outlets" (AR, ECF No. 25-3 at 48.) |
| 6/23/2017 | Joseph City, Arizona (AR, ECF No. 25-4 at 15.) |
| 6/24/2017 | Regarding map of western United States road trip across multiple states, Mr. Luna comments "awesome bucket list item done" (AR, ECF No. 25-3 at 158) and "4121.8 miles in 23 days" (AR, ECF No. 25-4 at 12). |
| 7/8/2017 | Tierra Del Sol Golf Club (AR, ECF No. 25-2 at 387–88.) |
| 7/15/2017 | Cumbres & Toltec Scenic Railroad, Chama, NM (*Id.* at 384.) |
| 8/2/2017 | San Felipe Pueblo RV Park (*Id.* at 378.) |
| 8/3/2017 | La Junta campground, Colorado (*Id.* at 375.) |
| 8/4/2017 | Picture of Mr. Luna standing unassisted next to Nebraska highway sign (AR, ECF No. 25-3 at 162.) |
| 8/7/2017 | Freemont, Nebraska (AR, ECF No. 25-2 at 373–74.) |
| 8/14/2017 | Boone, Iowa (*Id.* at 370.) |
| 8/15/2017 | Iowa State Fair (*Id.* at 369.) |
| 8/20/2017 | Kid Rock Concert at Iowa State Fair (AR, ECF No. 25-3 at 186.) |
| 8/22/2017 | King's Pointe Waterpark Resort, Iowa (AR, ECF No. 25-2 at 366.) |
| 8/23/2017 | Columbus, Nebraska (*Id.*) |
| 8/24/2017 | Trenton, Nebraska (*Id.* at 364.) |
| 8/26/2017 | Fort Carson, Colorado (*Id.* at 363.) |

2017, UNUM contacted Mr. Luna's medical providers to ascertain when they had last treated Mr.

Luna, and UNUM learned the following information:

| | | |
|---|---|---|
| *Dr. Hicks*: | Last office visit:<br>Next office visit: | March 1, 2017<br>scheduled for Sept. 5, 2017, but Mr. Luna was a no-show and did not reschedule. |
| *Dr. Sanchez*: | Last office visit:<br>Next office visit: | July 11, 2017[10]<br>None scheduled (as of Sept. 13, 2017) |
| *Dr. Lujan*: | Last office visit:<br>Next office visit: | March 14, 2017<br>None scheduled (as of Sept. 13, 2017) |
| *Dr. Wells*: | Last office visit:<br>Next office visit: | October 13, 2016<br>sleep study scheduled for May 2, 2017, but Mr. Luna was a no-show and did not reschedule |
| *Dr. Pacheco*: | Last office visit:<br>Next office visit: | November 15, 2016<br>None scheduled (as of Sept. 14, 2017) |

(*See* AR, ECF No. 25-4 at 125-26, 128-29, 135.)

After receiving this information, UNUM sent Mr. Luna a letter on September 14, 2017, asking him to complete a disability status update form. (*Id.* at 131.) On the form, Mr. Luna was asked to describe his day-to-day activities, to which he responded: "wake up, move to living room – take meds, move to kitchen for breakfast, lunch, supper – using wheelchair, cane or walker depending on what kind of day it is." (*Id.* at 146.) In addition, he indicated that he was unable to care for himself and needed his wife's daily assistance because he suffered from chronic pain and headaches. (*Id.*) He reported that he was still taking prednisone, tramadol, and demerol. (*Id.*) He also indicated that he had scheduled visits with the following medical providers: Dr. Sanchez (Oct. 15, 2017); Dr. Pacheco (Nov. 8, 2017); Dr. Hicks (Nov. 15, 2017). (*Id.* at 145.) Meanwhile, Mr.

---

[10] Medical records submitted later on showed that Dr. Sanchez last saw Mr. Luna on July 30, 2017. *See* Doc. 25-4 at 145.

Luna continued his travel activities, taking RV trips to Colorado and Nebraska in September and October 2017. (*See* AR, ECF No. 25-5 at 40–44.)

On or about October 24, 2017, UNUM conducted an internal review of Mr. Luna's claim. (*See id.* at 12-15.) It appeared to the reviewers that "the intensity of care and documented activities are not consistent with opined r/ls [restrictions or limitations]." (*Id*. at 15.) The reviewers also noted that two doctors had opined that Mr. Luna had no functional restrictions or limitations. (*Id*.) But, because there were still two providers, Dr. Sanchez and Dr. Pacheco, who had opined otherwise, UNUM decided to appoint a medical consultant, Dr. James Haller, M.D., to review Mr. Luna's claim file and to contact Dr. Sanchez and Dr. Pacheco regarding their opinions. (*See id*. at 15–16, 24.) On October 24, 2017, Dr. Haller told Dr. Sanchez that, based on his review of the claim file, "it did not appear that the medical information supported impairment." (*Id*. at 24.) Dr. Haller shared the reasons underlying his view:

> [T]he information in the file included a release from Mr. Luna's orthopedist and pulmonologist and that Mr. Luna had no showed for a sleep study on 5/2/17 and has not rescheduled as of 9/13/17. I noted that Dr. Pacheco's records reflected normal sedimentation rates and minimal CRP elevations and that Mr. Luna has not seen Dr. Pacheco since November 2016 which appears inconsistent with an impairing rheumatologic condition. I stated that Mr. Luna reported he is requiring assistance with self-care and daily activities and is using "a wheelchair, cane, or walker depending on what kind of day it is." The medical records do not reflect his use of assistive devices and Facebook postings reflect the purchase of a large recreational vehicle with multiple posts reflecting travel in the past year including Las Vegas, Colorado, and the West Coast with over 4100 miles traveled in 23 days during June 2017.

(*Id*.) According to Dr. Haller, Dr. Sanchez told him on the phone that he was deferring his opinion on impairment to Dr. Pacheco and that Mr. Luna should follow-up for his sleep study. (*Id*.)

Dr. Haller was unsuccessful in reaching Dr. Pacheco by phone, and eventually sent him a letter seeking information on Mr. Luna's condition. (*See id*. at 19–20.) Mr. Haller shared his concerns that Mr. Luna's last office visit with Dr. Pacheco was in November 2016, and the lack

of rheumatologic follow-up since then appeared inconsistent with the presence of a rheumatologic condition or chronic pain severe enough to interfere with employment and activities of daily living as Mr. Luna claimed. (*Id*. at 20.)

On October 30, 2017, Dr. Pacheco faxed his clinical office note to Dr. Haller for an October 26, 2017 office visit by Mr. Luna during which Mr. Luna complained of numerous ailments: pulmonary issues, hypoventilation, possible apnea, pain involving his neck, hands, and feet; being unable to use his hands, which were crushed while he was in the service; short-term memory issues, and mood issues. (AR, ECF No. 25-5 at 67.) He reported that he had been seen at the VA recently where providers told him he had a broken back in two places, and they diagnosed him with PTSD. (*See id.*) Dr. Pacheco opined that it does not appear he had polymyalgia rheumatica, noting that after discontinuing the prednisone, he did not seem any worse. (*Id.* at 68.) According to Dr. Pacheco, "I would be unable to state that he is unable to work because of the polymalgia [sic] rheumatica." (*Id.*) He further stated that it was unclear whether his unresolved pain related to previous orthopedic issues, psychiatric issues, or possible sleep apnea would be sufficient to keep him from working. (*Id.*) Dr. Pacheco said he would refer him to the lab for additional tests and screening to determine if there is some other underlying connective tissue disorder. (*Id.*)

In late October 2017, Mr. Luna expressed to UNUM that he was upset UNUM hired a medical consultant, explaining that they have an automatic RV and his son accompanied them so his son could share in the driving. (*See id.* at 64.) In an early November 2017 call to UNUM, Mr. Luna stated that he could not do a sleep study due to his shoulder surgery and he was awaiting insurance approval for a sleep study. (*See id.* at 86.) As for the Facebook posts, he said that it is not real; it is a place where you document the happy things. (*See id.* at 87.) He explained that his son and wife drove the RV, it was a "window tour," he was strapped into his seat, he looked out

the window, and they did not walk around places. (*See id.* at 87-89.) Mr. Luna explained that his

VA records would show he has pain coming from many different areas, and that the VA told him

his back was broken in two places. (*Id.* at 88.) He reported that the VA told him he is 50% disabled

from PTSD and 20% disabled due to his hands. (*Id.*) When asked if the VA was treating him for

any condition, including for PTSD, Mr. Luna said no. (*Id.* at 88.) Mr. Luna said he would send the

VA records as soon as he could. (*See id.* at 89.)

UNUM subsequently sought Mr. Luna's medical records from the VA, and it received

them on November 2, 2017. (*See* AR, ECF No. 25-5 at 80, 90.) According to the VA records, VA

providers saw Mr. Luna for rheumatoid arthritis and fibromyalgia, among other complaints, on

April 20, 2017, and that the findings showed "mild degenerative arthrosis of the left knee;" no

evidence of significant degenerative arthrosis of the right knee; unremarkable joint spaces and soft

tissues; no significant degenerative change or soft tissue swelling in his ankles; normal left and

right ankles; minimal degenerative change of the lumbar spine, with well preserved disc spaces;

and severe facet and disc degenerative changes of the cervical spine, including anterolisthesis of

C4 on C5 and neural foraminal stenosis. (*See id.* at 94-100.) In the functional impact portion of the

progress notes, the VA examiner reported that Mr. Luna's assessment is that his back condition

severely impaired sedentary and physical work, while the examiner's assessment was that the

condition "overall mildly to moderately impairs sedentary work and moderately impairs physical

work." (*Id.* at 135.) As for Mr. Luna's shoulder condition, the VA examiner assessed that the

condition "overall mildly impairs sedentary work and moderately impairs physical work." (*Id.* at

154.) Mr. Luna reported occasional use of a wheelchair, crutches, and cane for his back, hips,

knees, and ankles. (*See id.* at 168-69.) The VA examiner concluded that his ankle and knee

conditions "overall mildly impairs sedentary work and moderately impairs physical work." (*Id.* at 171, 191.)

As for his fibromyalgia, Mr. Luna reported stiffness and weakness in all four extremities daily, fatigue, sleep disturbance, constant headaches, depression, among others. (*See* AR, ECF No. 25-5 at 194-95.) Mr. Luna stated that his fibromyalgia severely impacted his physical work, and the examiner said that the condition "overall mildly to moderately impairs sedentary work and severely impairs physical work." (*Id.* at 197.) Notably, there were no significant diagnostic test findings or results. (*Id.* at 196.) A medical note stated that a March 2017 Behavioral Health C&P Exam gave Mr. Luna a diagnosis of chronic PTSD, and that he reported depressive symptoms. (*Id.* at 197.) As for his headaches, Mr. Luna reported a daily headache that never goes away. (*Id.* at 199.) Both Mr. Luna and the VA examiner assessed that his headaches severely impair his sedentary and physical work. (*Id.* at 200.) The examiner found that chronic fatigue syndrome did not impact his ability to work. (*Id.* at 204.) Regarding his respiratory condition, Mr. Luna reported coughing every morning and spitting out dark green phlegm, hypoxemia, and the need for supplemental oxygen. (*See id.* at 206-07.) The examiner concluded that his respiratory condition "mildly to moderately impairs sedentary work and severely impairs physical work." (*Id.* at 208.)

Mr. Luna also had a VA visit on June 2, 2017, for his hands. (*See id.* at 101-02.) Mr. Luna said his left hand was crushed in a closing hatch while in the Navy. (*Id.* at 102.) The provider noted his observations:

> [D]uring conversation with the patient while he is explaining his hand/finger condition he is able to gesticulate and points with his right index finger straight out (fully extended) and he is able to grasp and pinch with L index finger and thumb to handle a magazine. When asked to actively demonstrate his range of motion and grip and hand function he virtually cannot straighten or flex his fingers beyond the semiflexed position of all fingers. During exam he says he cannot actively bend or grasp with fingers but when I tested individual fingers for strength while distracting him he appears to have normal (4.5-5/5) strength in the hands. Both hands are well

21

> muscled, showing no atrophy which would be expected if he were unable to move his hands as he demonstrated when requested to move fingers in flexion and extension. Overall, the exam during active demonstration by veteran is not consis[]tent with the observation of hand use and strength at other times during the interview.

(*Id.* at 102-03.) His provider concluded that, although Mr. Luna reported not being able to grip with either hand, the physical exam was variable and inconsistent, so no accurate comment could be made regarding his hand function. (*See id.* at 112-13.)

On July 24, 2017, the VA notified Mr. Luna by letter that they decided he had PTSD, now claimed as memory loss, that is 50% disabling. (AR, ECF No. 25-5 at 243.) The 50% evaluation was based in part on "Occupational and social impairment with reduced reliability and productivity." (*Id.*) The VA assigned a 10% disabling evaluation for "osteoarthritis, index and long finger of left hand with gap," and another 10% for "osteoarthritis, thumb of the left hand with gap." (*Id.* at 244.)

Mr. Luna had medical visits with Dr. Sanchez on October 6, 2017; November 8, 2017; and December 6, 2017. (*See id.* at 249, 252, 307, 312, 315.) On October 6, 2017, he reported chronic headaches and was seen for a pneumonia vaccine. (*See id.* at 307-08.) In his November 8, 2017 visit, Mr. Luna complained of, among other things, migraines, chronic pain, anxiety, sleep apnea, chronic cough, and PTSD. (*Id.* at 315.) As for the PTSD, he could not recall when his symptoms began and described his symptoms as moderate. (*Id.*) Dr. Sanchez noted that Mr. Luna remained totally disabled. (*Id.* at 317.) Mr. Luna reported to UNUM on November 8, 2017, that he attempted to make an appointment at the VA for his PTSD diagnosis but there was a 6-month wait. (*See id.* at 250.) During his December 6, 2017 visit with Dr. Sanchez, complained of lung pain, midline back pain, and right hip pain. (AR, ECF No. 25-5 at 312.) In the "Problem list," Dr. Sanchez's report for that visit detailed, among other problems, osteoarthritis, rheumatoid arthritis, bursitis,

rotator cuff rupture, fibromyalgia, PMR, pulmonary hypertension, nausea, PTSD, sleep apnea, migraine, anxiety, and thoracic back pain. (*Id.*) On December 11, 2017, Mr. Luna underwent a Home Sleep Apnea Test, the results of which supported a diagnosis of severe Obstructive Sleep Apnea. (*Id.* at 310-11.)

On January 2, 2018, Dr. Hicks faxed his answers to a UNUM letter requesting information on Mr. Luna, and he opined that Mr. Luna was able to perform the noted functional activities on a full-time basis. (*Id.* at 288-90.) At a January 16, 2018 office visit, Dr. Hicks noted that Mr. Luna reported an ongoing morning cough, was not using oxygen, his need for oxygen had "resolved during day, follow up sleep for night eval," and he had a "normal six min walk." (*Id.* at 469-70.)

On January 3, 2018, Dr. Pacheco responded to UNUM's letter requesting information by deferring to another provider, but without listing the name of the provider. (*See* AR, ECF No. 25-5 at 294-95.) Upon UNUM's follow up with Dr. Pacheco, he clarified that his autoimmune-related issues evaluation for Mr. Luna was negative so that he could not comment further. (*See id.* at 398-99, 456.)

Dr. Sanchez also responded to UNUM's letter on January 17, 2018, stating that Mr. Luna was not able to perform the listed functional activities full-time, he was deferring to another provider (but did not name), he had referred Mr. Luna to orthopedics, and Mr. Luna could not work due to dyspnea on exertion and bilateral shoulder weakness. (*See id.* at 360-61, 456.) UNUM repeatedly called Dr. Sanchez's office to try to clarify his answers, particularly if he was deferring to another physician, but he did not respond at that time. (*See id.* at 394-95.)

In March 2018, UNUM had a private investigator surveil Mr. Luna. (*See* AR, ECF No. 25-6 at 16-33.) According to the surveillance report, Mr. Luna went to Hawaii with his family for Christmas 2017. (*Id.* at 21; AR, ECF No. 25-5 at 524-32). On March 7, 2018, investigators

observed and took photographs of Mr. Luna driving, walking unassisted, going into a restaurant, and shopping while holding a bag (*See* AR, ECF No. 25-6 at 21-28.)

That same day, Mr. Luna visited Dr. Hicks, who reported a normal chest imaging and a normal six-minute walk test from January 16, 2018. (*See id.* at 45-46.) Dr. Hicks noted his cough was likely caused by GERD, that Mr. Luna was awaiting a CPAP for obstructive sleep apnea, and that he needed follow-up in one year for his cough. (*See id.* at 46-47.) In April 2018, Dr. Hicks again confirmed that Mr. Luna was able to perform the listed functional activities. (*Id.* at 83.)

Dr. Haller spoke to Dr. Sanchez on May 14, 2018, about the restrictions and limitations ("R&Ls") he listed on January 17, 2018, and Dr. Sanchez answered that he deferred to Mr. Luna's specialists and the recent R&Ls were based solely on what Mr. Luna reported to him. (AR, ECF No. 25-6 at 121.) Two days later, Mr. Luna told UNUM that he was informed that Dr. Pacheco told UNUM that he could go back to work, so Dr. Sanchez would release him to work as well, but Mr. Luna explained that he had not seen Dr. Pacheco since December 2017 because he did not take his insurance and was looking for a new rheumatologist. (*Id.* at 124.) That same day, UNUM spoke to Mr. Luna's wife who reported, among other things, that she had to bathe and dress Mr. Luna, he could not go to appointments without his wheelchair since January 2018, he was confined to his walker in the house, and he could not travel since the RV trip the past summer. (*See id.* at 125-26.)

UNUM spoke to Dr. Sanchez again on May 31, 2018 to determine if he had an opinion on Mr. Luna's R&Ls. (*See id.* at 131.) Dr. Sanchez stated that he had no opinion on Mr. Luna's functional capacity and would defer R&Ls to the rheumatologist who would next see Mr. Luna. (*See id.*) The next day, UNUM called Mr. Luna to ask some follow up questions. (*See id.* at 133.) Mr. Luna reported he had not yet seen a new rheumatologist; he had not yet been in treatment for

PTSD but was waiting on the VA to approve his request for treatment; he was not seeing a new orthopedist. (*See id.*)

### E.   UNUM's denial of LTD benefits and Mr. Luna's appeal

On June 5, 2018, UNUM notified Mr. Luna of its decision to discontinue LTD benefits payments. (AR, ECF No. 25-6 at 154.) UNUM explained its decision was based on discrepancies between his stated daily living restrictions and medical condition in 2017 and evidence in his social media accounts of extensive travel by RV, as well as inconsistencies between his wife's explanation of his limitations in a May 16, 2018 phone call and evidence of a Hawaii trip in December 2017 and from the investigator's March 7, 2018 surveillance. (*See id.* at 154-55.) UNUM further informed him that its review indicated improvement of his medical condition, explained the recent opinions of his physicians, and stated that his medical providers were no longer imposing R&Ls. (*See id.* at 156-57.)

By letter dated August 13, 2018, Mr. Luna through counsel appealed UNUM's denial of LTD benefits. (*Id.* at 190.) In support of his appeal, Mr. Luna provided a June 13, 2018 letter from Dr. Sanchez stating that Mr. Luna was unable to resume any type of gainful employment due to his physical and cognitive impairments and illnesses. (*See id.* at 192.) Dr. Sanchez explained that Mr. Luna was currently under treatment for osteoarthritis, polymyalgia rheumatica, giant cell arteritis, chronic headaches, chronic body pain, shoulder pain, and short-term memory loss, and that he was working to receive treatment from a neurologist, from a cardiologist, and for his PTSD. (*Id.*) According to Dr. Sanchez, Mr. Luna could not lift 20 pounds, nor frequently stand, sit, or keyboard. (*Id.*) Mr. Luna also attached an August 13, 2018 letter from the VA showing that he is 100% disabled due to his service-connected disabilities. (*Id.* at 193.) In addition, Mr. Luna provided an affidavit from his son who said he drove the RV on trips, he provided mobility

assistance and performed all the work required for the trip, his father rode as a passenger, and he escorted his father to Hawaii in December 2017, where his father used a wheelchair. (*Id.* at 196.)

UNUM received additional VA records in August 2018. (*See* AR, ECF No. 25-6 at 222.) On August 23, 2018, UNUM requested mental health treatment records from the VA (*See id.* at 375.) UNUM also received medical records from Mr. Luna's visits to Dr. Sanchez on May 16, 2018, during which Mr. Luna complained of shoulder, back, and chest pain and he was referred for cardiac care (*see id.* at 441-43); on June 6 and 13, 2018, in which Mr. Luna sought a referral for back pain to New Mexico Neurology (*see id.* at 435, 438-40); on July 10, 2018, during which Mr. Luna sought Dr. Sanchez to fill out his disability forms, (*see id.* at 432-34); and on August 2, 2018, in which his chief complaints were moderate to severe arthritis and moderate headaches (*see id.* at 429).

After continued investigation and review, UNUM asked Dr. Scott B. Norris to review Mr. Luna's file. (*See id.* at 500, 508, 518.) Dr. Norris concluded that, with a reasonable degree of medical certainty, the medical evidence did not support R&Ls that precluded Mr. Luna from performing sustained full time light work as of June 5, 2018. (*Id.* at 518.) Dr. Norris explained that, after the SSA award, Mr. Luna's rheumatologist, orthopedist, and pulmonologist all released him to return to work. (*Id.*) He noted that Mr. Luna's self-reported severity of impairment was inconsistent with recent examinations, observations, diagnostic testing, intensity of treatment, as well as with surveillance, social media, and his travel. (*See id.* at 518-22.) Because Dr. Norris's opinion differed from the June 13, 2018 opinion of Dr. Sanchez, he attempted to reach out to Dr. Sanchez for clarification by way of an October 3, 2018 letter. (*See id.* at 519, 523-26.) In response on October 12, 2018, Dr. Sanchez stated in writing that he disagreed with Dr. Norris's opinion that Mr. Luna had the capacity to perform full-time light work from June 5, 2018 on because "PTSD

26

100%." (AR, ECF No. 25-6 at 531.) Subsequently, Mr. Luna provided UNUM with an explanation of the VA's 100% disability decision in August 2018 in which it increased his "(PTSD), chronic (now claimed as memory loss)" from 50% disabling to 100% effective June 11, 2018. (*Id.* at 584.) UNUM attempted to discuss with Dr. Sanchez his most recent opinion, but his office advised he would not speak with UNUM because it was a legal matter. (*See id.* at 616-18.) Dr. Norris reviewed the above new and other additional information received by UNUM, but his opinion remained unchanged, particularly because there was no copy of the clinical visit or relevant testing underlying the PTSD diagnosis and the discrepancies between Mr. Luna's self-reported incapacities and findings on clinical evaluations and observations on surveillance. (*Id.* at 621-22.)

By letter dated October 24, 2018, UNUM notified Mr. Luna of its decision finding that Mr. Luna is no longer disabled within the terms of the Plan and affirming its initial decision to deny LTD benefits as of June 5, 2018. (*See id.* at 627-36.) On January 29, 2020, Mr. Luna filed suit against UNUM for breach of his ERISA rights. (Compl., ECF No. 1-2.) After removal, the parties filed cross motions for summary judgment, seeking a decision on the administrative record.

## III. Analysis

To show entitlement to LTD under the Plan, Mr. Luna must meet the Plan's definition of disability:

> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.
>
> You must be under the regular care of a physician in order to be considered disabled.

(AR, ECF No. 25-1 at 160, ECF No. 25-2 at 350.) The Plan defines "gainful occupation" as: "an occupation that is or can be expected to provide you with an income within 12 months of your

return to work, that exceeds: 80% of your indexed monthly earnings, if you are working; or 60% of your indexed monthly earnings, if you are not working." (AR, ECF No. 25-1 at 175.) According to the Plan, Mr. Luna must provide proof in support of his claim, including that he was under the regular care of a physician and the extent of his disability, including restrictions and limitations ("R&Ls") preventing him from performing his regular occupation. (*Id.* at 151.) The Plan informed him that UNUM may request that he send proof of continuing disability and UNUM must receive it within 45 days of its request. (*Id.*) Additionally, the Plan said that UNUM will end payments the date when he is no longer disabled under the terms of the Plan or the date he fails to submit proof of continuing disability. (*Id.* at 166.) According to the Plan's term, the "lifetime cumulative maximum benefit period for all disabilities due to mental illness is 24 months," subject to two exceptions not relevant here. (*Id.*)

Plaintiff urges the Court to reverse UNUM's decision to deny him LTD benefits because his primary care physician, Dr. Sanchez, reported that he was permanently disabled and unable to perform his occupational duties on July 7, 2017, as well as on June 13, 2018. Moreover, Plaintiff notes that his rheumatologist reported in September 2017 that he could not perform his occupational duties. Plaintiff contends that his medical records show that in December 2016 he was referred to a neurologist for frequent headaches, he had muscle aches and weakness, and he was prescribed supplemental oxygen. Finally, Plaintiff argues that the determinations by the SSA and VA that he is disabled support finding him disabled under the Plan.

On the other hand, UNUM asserts that its decision should be upheld because Mr. Luna failed to meet his burden of showing that medical R&Ls prevented him from working in his light-duty occupation. UNUM contends that the social media evidence reveals discrepancies between his activities and self-reported conditions to his medical providers. According to UNUM, none of

Mr. Luna's specialists support his claim beyond 2017 and his primary care physician provided only vague and inconsistent support that was not borne out by the records.

Although Plaintiff argues he was disabled, in his briefs he fails to apply the evidence in the record to the Plan terms. According to the Plan terms, after 24 months of receiving LTD benefits, Plaintiff must show that he was not capable of *any* occupation to which he was reasonably fitted by education, training, or experience. For Alion, Mr. Luna worked as a principal systems engineer. Plaintiff does not dispute how UNUM described the duties of his occupation in the record as a light duty job in which the physical demands were frequently sitting, keyboarding, talking, and hearing; and occasionally standing, walking, reaching, handling, and fingering; occasionally exerting up to 20 pounds of force; and travel at times. (*See* AR, ECF No. 25-2 at 305.)

Plaintiff instead relies primarily on Dr. Sanchez's opinions that he was disabled. In July 2017, Dr. Sanchez stated that Mr. Luna was not able to perform the occupational demands of his job on a full-time basis because he was disabled due to back pain and he could not lift over five pounds. (AR, ECF No. 25-2 at 117–18.) Dr. Sanchez further opined that it was undetermined when Mr. Luna could return to work because he was "permanently disabled." (*Id.* at 118.) Later records and evidence, however, cast doubt on the permanent nature of back pain that prevented him from doing light duty work. For example, a VA examiner reported that, while Mr. Luna assessed that his back condition severely impaired sedentary and physical work, the examiner concluded that the condition overall mildly to moderately impaired sedentary work and moderately impaired physical work. (AR, ECF No. 25-5 at 135.)

More significantly, in subsequent documentation, Dr. Sanchez no longer relied on Mr. Luna's back pain and/or not being able to lift five pounds as a basis for disability. In January 2018, the reason for Dr. Sanchez's opinion of Mr. Luna's disability changed to dyspnea on exertion and

bilateral shoulder weakness with the course of treatment being an "ortho referral." (*Id.* at 361.) His pulmonologist Dr. Hicks, however, diagnosed Mr. Luna with dyspnea on exertion and treated him with oxygen in November 2016, but by July 2017, and again in January 2018, Dr. Hicks opined that Mr. Luna could return to work, and Dr. Hicks believed Mr. Luna no longer needed oxygen. (*See* AR, ECF No. 25-2 at 92-93, 214; AR, ECF No. 25-5 at 289-90, 469-70.) Dr. Hicks noted that Mr. Luna had a "normal six min walk." (AR, ECF No. 25-5 at 470.) Similarly, his orthopedist opined that Mr. Luna could return to functional activities of his work and return to work as of March 14, 2017. (AR, ECF No. 25-2 at 306.) On May 31, 2018, in response to questioning, Dr. Sanchez informed UNUM that he had no opinion on Mr. Luna's functional capacity and would defer R&Ls to the rheumatologist who next evaluated Mr. Luna. (*See* AR, ECF No. 25-6 at 131.) Accordingly, as of June 5, 2018, Dr. Sanchez's opinions no longer supported R&Ls of all possible gainful occupations for Plaintiff.

As for Dr. Sanchez's June 13, 2018 letter, Plaintiff cannot show that it reliably establishes his disability. Dr. Sanchez's explanation that supported his opinion of Mr. Luna's disability changed over time. When UNUM reached out to Dr. Sanchez for clarification, Dr. Sanchez stated in writing that he disagreed with Dr. Norris's opinion that Mr. Luna had the capacity to perform full-time light work from June 5, 2018 and on because "PTSD 100%." (*Id.* at 531.) Plaintiff failed to submit evidence of the diagnostic tests leading to a PTSD diagnosis or records showing he was under the regular care of any medical provider for PTSD or how the PTSD resulted in R&Ls for work. Given Dr. Sanchez's shifting explanation for Mr. Luna's disability, and the lack of supporting documentation for his PTSD diagnosis, Plaintiff has not shown that Dr. Sanchez's opinions, as evidenced by the documented evidence, supports his claim of disability.

Moreover, as described below, his letter is not sufficient to contradict the overwhelming record evidence that Mr. Luna's medical condition had improved based on the opinions of his specialists and the diagnostic evidence. The weight to give his letter is also undermined by the reasons to doubt the credibility of Mr. Luna's self-reported medical conditions. *Cf. Prince v. Metropolitan Life Ins. Co.*, Civil No. 08-cv-471-JL, 2010 WL 988730, at *12 (D.N.H. Mar. 16, 2010) (explaining that insurer is not required to blindly accept conclusory findings of insured's physician, in particular where doctor deferred to insured's subjective claims of disability, doctor offered little specific explanation for how insured's symptoms would prevent her from performing her job tasks, and as symptoms changed, doctor engaged in little critical assessment of her ability to work); *Maniatty v. Unumprovident Corp.*, 218 F.Supp.2d 500, 504-55 (S.D.N.Y. Aug. 29, 2002), *aff'd* 62 F. App'x 413 (2d Cir. May 15, 2003) (concluding that, even under *de novo* standard, administrator's decision terminating benefits should be upheld where plaintiff did not raise claims of chronic fatigue syndrome and fibromyalgia until final appeal, there was no objective evidence establishing either ailment, just plaintiff's subjective reports, and only objective evidence of back pain was MRI showing small recurrent disc herniation, but all subsequent tests to uncover neurological damage were negative).

In addition to the opinions of Dr. Sanchez, Plaintiff relies on the opinion of his rheumatologist to support his disability. On September 19, 2017, Dr. Pacheco opined that Mr. Luna was unable to perform the functional demands of his own occupation. (AR, ECF No. 25-4 at 152–53.) Dr. Pacheco's opinion, however, also changed over time. In October 2017, Dr. Pacheco reported that it did not appear that Mr. Luna had polymyalgia rheumatica, so he "would be unable to state that he is unable to work because of the polym[y]algia rheumatica." (AR, ECF No. 25-5 at 68.) He further stated that it was unclear whether his unresolved pain related to previous orthopedic

issues, psychiatric issues, or possible sleep apnea would be sufficient to keep him from working. (*Id.*) In January 2018, Dr. Pacheco deferred to another provider about Mr. Luna's functional capacity (*see id.* at 294-95), and later clarified that his autoimmune-related issues evaluation for Mr. Luna was negative so that he could not comment further (*see id.* at 398-99, 456). As of June 2018, then, Dr. Pacheco no longer held an opinion that supported Mr. Luna's claim of disability.

Plaintiff further relies on the SSA's award of benefits. Mr. Luna's receipt of social security benefits, however, also does not support his continued eligibility for LTD benefits. Although Mr. Luna provided UNUM a copy of the letter awarding him social security benefits, the award letter did not specify the basis for the award. Despite repeated requests, UNUM received no additional information regarding the SSA's determination that Mr. Luna was eligible for benefits. Moreover, the SSA made its determination in 2017 without the benefit of later medical records that showed Mr. Luna's condition had improved. For example, there is evidence that Plaintiff claimed SSA disability due to a ruptured rotator cuff, which was subsequently repaired, and that he was on oxygen 24/7, but he subsequently improved enough to no longer be on oxygen. Moreover, his rheumatologist later concluded that he did not have PMR and that his auto-immune results were negative. UNUM had the benefit of his subsequent medical records when it made its decision to terminate benefits. Furthermore, although SSA determinations may be considered by an administrator as persuasive evidence, they are not binding. Instead, SSA determinations are "entirely different and separate from a claim under ERISA, with different parties, different evidentiary standards, and different bodies of law governing their outcomes." *See Wagner-Harding v. Farmland Indus. Inc. Emp. Ret. Plan*, 26 F. App'x 811, 817 (10th Cir. 2001) (unpublished). The Court therefore rejects Mr. Luna's contention that UNUM was required to continue paying LTD benefits because he was receiving SSA benefits.

Likewise, Mr. Luna's receipt of VA benefits does not establish his continued eligibility for LTD benefits. As indicated earlier, Mr. Luna was awarded full VA benefits due to PTSD. (*See* AR, ECF No. 25-6 at 586.) Mr. Luna's initial LTD claim, however, did not list PTSD as a basis for benefits. Although Mr. Luna subsequently sought LTD benefits based in part on PTSD, there was scant medical evidence in Mr. Luna's VA records showing the basis for that diagnosis or that he was receiving ongoing treatment for PTSD. The VA records UNUM obtained only included a notation that he received a March 2017 diagnosis of chronic PTSD. Although UNUM made multiple efforts to obtain mental health records from the VA, including the psychiatric exam and treatment records, no mental health records were ever provided. (*See, e.g.*, AR, ECF No. 25-6 at 375.) Aside from the limited information in the VA records, UNUM did not receive any other medical records showing that Mr. Luna required psychiatric care or outpatient treatment due to PTSD. Indeed, over many visits he had with his primary care provider, Dr. Sanchez, during the relevant time-period, there is no indication that Dr. Sanchez ever treated Mr. Luna for PTSD. As UNUM points out, the Plan required claimants to be under the regular care of a physician for any disabling condition and to provide proof of their claim. When it came to claiming eligibility for LTD benefits due to PTSD, Mr. Luna simply did not meet his burden of proof under the Plan. *See Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1296 (9th Cir. 2010) (for ERISA purposes, "the burden of proof continues to lie with the plaintiff when disability benefits are terminated after an initial grant").[11]

---

[11] UNUM also argues that the Plan has a limited pay period for disabilities due to mental illnesses. Under the Plan, the "lifetime cumulative maximum benefit period for all disabilities due to mental illness is 24 months." (AR, ECF No. 25-1 at 166 (emphasis removed); *see also id.* at 176 (defining mental illness as "a psychiatric or psychological condition classified in the Diagnostic and Statistical Manual of Mental Health Disorders (DSM) . . . Such disorders include, but are not limited to, psychotic, emotional or behavioral disorders, or disorders relatable to stress.")). Thus, even if the award of VA benefits could be used to establish Mr. Luna's continued eligibility for LTD benefits, benefits due to PTSD would be limited to a lifetime maximum of 24 months. Mr. Luna already received 24 months of benefits. Plaintiff failed to address this argument in his briefs, and thus, has not established he is entitled to LTD benefits after June 2018 based on the VA's award of benefits for PTSD.

As for the VA's earlier disability finding regarding the functionality of Mr. Luna's hands, the VA records indicate that on June 2, 2017, Mr. Luna's stated difficulties with his hands were inconsistent with the provider's observations of Mr. Luna's abilities when Mr. Luna was distracted. Significantly, none of Mr. Luna's non-VA medical providers listed R&Ls due to functional loss in his hands. Nor has Mr. Luna cited to record evidence showing that any VA medical provider was treating him for the medical condition of his hands or continues to treat him for any such condition.

Plaintiff also relies on the VA's note that Mr. Luna's respiratory condition impacts his ability to work. (*See* AR, ECF No. 25-6 at 337.) The respiratory condition was described as his chronic cough and phlegm with hypoxemia, and the VA examiner noted that Mr. Luna required oxygen therapy. (*Id.*) The examiner opined that the condition mildly to moderately impaired sedentary work. (*Id.* at 338.) The examiner, however, noted that no definitive specific diagnosis could be rendered because Mr. Luna declined a diagnostic lung biopsy and declined to see a VA pulmonologist, preferring to follow up with Dr. Hicks. (*Id.*) Dr. Hicks, however, opined that Mr. Luna could return to work, was no longer using oxygen, and had a normal six-minute walk test. The specialist's opinion and the objective diagnostic tests therefore do not support a finding of disability based on Mr. Luna's respiratory condition.

Of additional significance, Mr. Luna's self-reports of his condition and his wife's reporting of Mr. Luna's condition are inconsistent with social media evidence, surveillance evidence, and objective medical evidence. For example, in April 2017, Mr. Luna reported that he spent his days in his robe moving from the bed, to the sofa to watch television, and to and from the bathroom. (*See* AR, ECF No. 25-2 at 17.) In September 2017, Luna described his day-to-day activities as waking up, moving to the living room, taking medication, moving to the kitchen for meals, and

using a wheelchair, cane or walker depending on what kind of day it was. (AR, ECF No. 25-4 at 146.) Yet, evidence showed Mr. Luna engaging in extensive travel in 2016 and 2017 that was inconsistent with the severe limitations in capacity he was reporting to UNUM. In May 2018, Mr. Luna's wife reported to UNUM that she bathed and dressed Mr. Luna, he could not go to appointments without his wheelchair since January 2018, he needed his walker to move around the house, and he could not travel since the RV trip the past summer. (AR, ECF No. 25-6 at 125-26.) Once again, these claims of incapacity were inconsistent with the December 2017 trip to Hawaii, with the March 2018 surveillance that showed Mr. Luna walking without assistance to and from appointments and errands, and with medical records, such as Mr. Luna having a normal six-minute walk test. Furthermore, Dr. Sanchez's opinion concerning R&Ls on January 17, 2018, was based solely on what Mr. Luna reported to him (AR, ECF No. 25-6 at 121), so the surveillance and social media evidence undermines the strength of that opinion as well. Given this evidence of malingering, it is reasonable to look to more objective evidence about Mr. Luna's claimed medical conditions, rather than relying solely on his self-reporting of symptoms.

In sum, the Court, upon *de novo* review of the records, concludes Mr. Luna has not shown, by a preponderance of the evidence, that he remained disabled as of June 5, 2018, within the meaning of the Plan. Therefore, the Court will deny Mr. Luna's Motion and grant UNUM's Motion.

**IT IS THEREFORE ORDERED** that:

1. Plaintiff's Memorandum Brief in Support of Reinstatement of LTD Benefits (**ECF No. 18**) is **DENIED**;

2. UNUM'S Motion for Decision on the Administrative Record (ECF No. 20) is **GRANTED**;

3. Defendant is entitled to summary judgment in its favor on Plaintiff's claim for breach of ERISA rights; and

4. This case is **dismissed with prejudice**.

_____

SENIOR UNITED STATES DISTRICT JUDGE